UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

_____

ANTHONY C.,[1]

                        Plaintiff

-vs-

COMMISSIONER OF SOCIAL
SECURITY,

                        Defendant.

_____

DECISION AND ORDER

1:19-CV-0688 CJS

INTRODUCTION

This is an action brought pursuant to 42 U.S.C. § 405(g) to review the final

determination of the Commissioner of Social Security ("Commissioner" or "Defendant")

which denied the application of Plaintiff for Supplemental Security Income ("SSI") benefits.

Now before the Court is Plaintiff's motion (ECF No. 10) for judgment on the pleadings and

Defendant's cross-motion (ECF No. 11) for the same relief.   For the reasons discussed

below, Plaintiff's application is denied, Defendant's application is granted, and this action is

dismissed.

STANDARDS OF LAW

The Commissioner decides applications for SSDI and SSI benefits using a five-step

sequential evaluation:

> A five-step sequential analysis is used to evaluate disability claims. *See* 20
> C.F.R. §§ 404.1520, 416.920.   First, the Commissioner considers whether
> the claimant is currently engaged in substantial gainful activity. If he is not,
> the Commissioner next considers whether the claimant has a severe

_____

[1]  The Court's Standing Order issued on November 18, 2020, indicates in pertinent part that, "[e]ffective immediately, in opinions filed pursuant to Section 205(g) of the Social Security Act, 42 U.S.C. § 405(g), in the United States District Court for the Western District of New York, any non-government party will be identified and referenced solely by first name and last initial."

impairment which significantly limits his physical or mental ability to do basic work activities. If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which is listed in the regulations [or medically equals a listed impairment]. Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, he has the residual functional capacity to perform his past work.[2] Finally, if the claimant is unable to perform his past work, the Commissioner then determines whether there is other work which the claimant could perform.   The claimant bears the burden of proof as to the first four steps, while the Commissioner bears the burden at step five.

*Colvin v. Berryhill*, 734 F. App'x 756, 758 (2d Cir. 2018) (citations and internal quotation marks omitted)

An unsuccessful claimant may bring an action in federal district court to challenge the Commissioner's denial of the disability claim.   In such an action, "[t]he court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 42 U.S.C.A. § 405(g) (West).   Section 405(g) states, in relevant part, that "[t]he findings of the Commissioner of Social security as to any fact, if supported by substantial evidence, shall be conclusive."

The issue to be determined by the court is whether the Commissioner's conclusions "are supported by substantial evidence in the record as a whole or are based on an erroneous legal standard." *Schaal v. Apfel*, 134 F.3d 496, 501 (2d Cir. 1998); *see also, Barnaby v. Berryhill*, 773 F. App'x 642, 643 (2d Cir. 2019) ("[We] will uphold the decision if

---

[2] Residual functional capacity "is what the claimant can still do despite the limitations imposed by his impairment." *Bushey v. Berryhill*, 739 F. App'x 668, 670–71 (2d Cir. 2018) (citations omitted); *see also*, 1996 WL 374184, Titles II & Xvi: Assessing Residual Functional Capacity in Initial Claims, SSR 96-8P (S.S.A. July 2, 1996).

it is supported by substantial evidence and the correct legal standards were applied.")
(citing *Zabala v. Astrue*, 595 F.3d 402, 408 (2d Cir. 2010) and *Talavera v. Astrue*, 697 F.3d
145, 151 (2d Cir. 2012).").

"First, the [c]ourt reviews the Commissioner's decision to determine whether the
Commissioner applied the correct legal standard." *Tejada v. Apfel*, 167 F.3d 770, 773 (2d
Cir. 1999); *see also, Pollard v. Halter*, 377 F.3d 183, 189 (2d Cir. 2004) ("[W]here an error
of law has been made that might have affected the disposition of the case, this court
cannot fulfill its statutory and constitutional duty to review the decision of the administrative
agency by simply deferring to the factual findings of the ALJ. Failure to apply the correct
legal standards is grounds for reversal.") (citation omitted).

If the Commissioner applied the correct legal standards, the court next "examines
the record to determine if the Commissioner's conclusions are supported by substantial
evidence." *Tejada v. Apfel*, 167 F.3d at 773.   Substantial evidence is defined as "more
than a mere scintilla.   It means such relevant evidence as a reasonable mind might accept
as adequate to support a conclusion." *Id*. (citation omitted).

> The substantial evidence standard is a very deferential standard of review—
> even more so than the 'clearly erroneous' standard, and the Commissioner's
> findings of fact must be upheld unless a reasonable factfinder would have to
> conclude otherwise." *Brault v. Social Sec. Admin., Comm'r*, 683 F.3d 443,
> 448 (2d Cir. 2012) (per curiam) (emphasis in original). "An ALJ is not
> required to discuss every piece of evidence submitted, and the failure to cite
> specific evidence does not indicate that such evidence was not considered.
> *Id*.

*Banyai v. Berryhill*, 767 F. App'x 176, 177 (2d Cir. 2019), as amended (Apr. 30, 2019)
(internal quotation marks omitted).

In applying this standard, a court is not permitted to re-weigh the evidence. *See, Krull v. Colvin*, 669 F. App'x 31, 32 (2d Cir. 2016) ("Krull's disagreement is with the ALJ's weighing of the evidence, but the deferential standard of review prevents us from reweighing it."); *see also, Riordan v. Barnhart*, No. 06 CIV 4773 AKH, 2007 WL 1406649, at *4 (S.D.N.Y. May 8, 2007) ("The court does not engage in a *de novo* determination of whether or not the claimant is disabled, but instead determines whether correct legal standards were applied and whether substantial evidence supports the decision of the Commissioner.") (citations omitted).

## FACTUAL and PROCEDURAL BACKGROUND

The reader is presumed to be familiar with the facts and procedural history of this action.   The Court will refer to the record only as necessary for purposes of this Decision and Order.

Plaintiff claims to be disabled due to mental impairments.   Plaintiff attended public school until the 10th grade, when he dropped out purportedly due to his anxiety at being around large groups of people.   Plaintiff has indicated that he enjoyed school up to the middle-school years, when he was in classes with a small number of students, but that he became anxious and panicky after moving to high school where the class sizes were larger.   While in school Plaintiff was classified as "other health impaired" due to a diagnosis of attention deficit hyperactivity disorder ("ADHD").   Education records indicate that Plaintiff was cooperative with adults but was distractible and needed to focus more on his schoolwork.   After Plaintiff dropped out of school, his school's committee on special education ("CSE") encouraged him to either obtain his general equivalency diploma ("GED") or pursue vocational training.   Plaintiff has made some effort at pursuing his GED

4

but generally has not followed through, purportedly due to anxiety and lack of motivation. In that regard, Plaintiff acknowledged that, while he could have pursued his GED online from the comfort of his own room, he did not because "the motivation factor just wasn't there."[3]   Plaintiff has also not pursued vocational training and has never held a job or applied for one.

Plaintiff, who was 27 years of age at the time of the administrative hearing, lives with his mother, receives public assistance, and generally remains in his room, watching television, using the computer and playing computer games. Plaintiff claims that, except for doing laundry, he essentially does not get around to doing any activities of daily living for himself, such as cooking, chores and even showering, due to feeling unmotivated.[4] Plaintiff claims that he typically avoids going out in public because he feels that he is being "judged," and that he usually wears a hoodie sweatshirt to "shield" himself from people's view.[5]   Plaintiff has some friends, including a girl in the UK that he used to communicate with daily via the internet, and a male friend who accompanied him to one of his psychiatric evaluations.[6] Plaintiff also maintains relationships with certain family members.[7]

Plaintiff has pursued mental health treatment, consisting of psychotherapy sessions with licensed-clinical-social-worker therapists and periodic medication-management visits with consulting psychiatrists who have prescribed various medications for Plaintiff's anxiety and depression.[8]   However, Plaintiff has been inconsistent in taking his medication.   He

---

[3] Tr. at p. 48.
[4] Tr. at p. 82.
[5] Tr. at p. 84.
[6] Tr. at p. 660.
[7] Tr. at p. 674.
[8] Plaintiff was hospitalized once for a week following an argument in which his mother claimed that he had threatened suicide, but Plaintiff claims that he did not actually threaten suicide and was not suicidal.

has been somewhat more consistent in attending therapy sessions, although at one point he was terminated as a patient due to his failure to comply with the "attendance agreement" he made with his therapist. On another occasion, Plaintiff was terminated as a patient after he claimed that he had been lying to his therapist by falsely claiming that he had made progress toward treatment goals.

Mental status examinations by therapists and psychiatrists typically report benign objective findings, though Plaintiff often appears anxious and depressed and exhibits odd behaviors such as wearing a hooded sweatshirt in the summertime purportedly to "hide" his face from the world.   However, treatment providers have noted improvements in Plaintiff's appearance, behavior and reported symptoms when he takes his medications. Notably, treatment providers have consistently indicated that Plaintiff is *capable* of taking his medication and complying with treatment recommendations,[9] but that he does not do so for reasons including fear of side effects and lack of motivation.   Plaintiff, though, has exhibited better compliance when he has been motivated to do so by external factors, such as threats by his mother to evict him.   Plaintiff has also demonstrated that he can comply with treatment and attend therapy sessions when it is required as a condition of receiving "cash assistance."[10]   As one therapist noted, "He denied any barriers to attending treatment except that he needs to push himself to stay 'on track.'"[11]

The record indicates that Plaintiff's condition has improved when he has followed

---

[9] *See*, e.g., Tr. at p. 750.
[10] "Needs his cash assistance and wants to continue mh [mental health treatment] because of it." Tr. at p. 669.
[11] Tr. at p. 730.

treatment recommendations.[12]    For example, at one session Plaintiff indicated that he had overcome his fear of driving and had driven himself to the appointment rather than relying on his mother for transportation.[13]    However, as mentioned earlier Plaintiff has also claimed to have lied to his therapist about having made progress.[14]

Plaintiff's claim for SSI benefits was denied initially.    Thereafter, a hearing was held before an Administrative Law Judge ("ALJ") at which Plaintiff, his mother and a vocational expert testified.[15]    As noted earlier, Plaintiff indicates that he usually wears a hoodie sweatshirt or other head covering to shield himself from people.    However, Plaintiff did not wear any such covering to the hearing, purportedly since he knew that it would be "not appropriate" to do so.[16]    Similarly, Plaintiff mentioned that while he prefers to be alone, he was able to come to the hearing and testify, even though it made him feel "a little shaky."[17]

Plaintiff indicated that he felt uncomfortable testifying, since the focus of the hearing was on him.    When asked to explain what he was feeling, Plaintiff indicated that he was having "racing thoughts" and felt "a little bit anxious."[18]    Plaintiff stated, however, that his medication was helpful in that regard, adding: "It would definitely be a lot worse if I was not medicated, but even then, I find myself going into slight panic attacks, like especially with people I'm not familiar with."[19]

Plaintiff admitted that he sometimes missed medical appointments, and that he had

---

[12] See, e.g., Tr. at pp. 707, 712, 743, 746, 750, 819-820, 834, 850, 854.
[13] Tr. at p. 751.
[14] Tr. at 858-859.
[15] There have actually been two hearings in this matter.    A second hearing was held after the matter was remanded.
[16] Tr. at p. 84.
[17] Tr. at pp. 89-90.
[18] Tr. at p. 81.
[19] Tr. at p. 81.

"a major issue with keeping appointments" at one treatment facility because he felt that the therapist was "too demanding" and was "pretty much trying to push [him] to go out and do things that [he] clearly was not ready for."[20]   Plaintiff also indicated that he did not take his medications "like he was supposed to," and indicated that was "mainly" because he is afraid of what the medications might do to him, since he once had a bad reaction to the medication Lexapro.[21]   Plaintiff admitted, though, that his current medications helped him, and that his counselors commented on this, though he indicated that even when taking medication he did not feel completely free of anxiety.[22]   Plaintiff also admitted that he did not follow his therapist's other treatment recommendations, such as to go outside more and walk around, since he did not feel comfortable doing so.[23]

The ALJ sought clarification from Plaintiff as to why he did not take his medications regularly,[24] and Plaintiff reiterated that he was fearful because he had once had a bad experience with Lexapro.   Plaintiff indicated that, although his doctors had placed him on other medication which did not have any ill effects, "the doubt was still there."[25]   The ALJ discussed how sometimes it took trial and error to find a really effective medication, and asked Plaintiff why he was not willing to try different drugs until he found one that he liked, but Plaintiff did not really offer any explanation, other than to say essentially that he "did not want to go through that."[26]

---

[20] Tr. at p. 88.
[21] Tr. at p. 55.
[22] Tr. at p. 56.
[23] Tr. at pp. 56-57.
[24] Tr. at p. 63 ("ALJ: Can you tell me what the barriers are for you to taking medication regularly?").
[25] Tr. at p. 66.
[26] Tr. at p. 67.

During the hearing, the ALJ noted that although the treatment notes and mental status examinations were generally unremarkable, there was an RFC report from Dr. Samant, the psychiatrist who monitored Plaintiff's medications, indicating that Plaintiff had "no useful ability" to perform the mental demands of employment.   The ALJ asked Plaintiff's counsel if he could explain the apparent discrepancy between Samant's RFC report and treatment notes that Samant had made a month earlier showing normal findings.   Plaintiff's counsel agreed that there was such a discrepancy, and indicated that he could not explain it:

> ALJ:   Counselor, you pointed out this medical source statement that we have at [Exhibit] 19F from Dr. Samant.   It's dated 6/13/13.   If you'll look at – and it shows no useful ability to maintain socially appropriate behavior, work in proximity, sustained routine, make simple work related decisions, perform at a consistent pace, ask simple questions, accept instruction, get along with coworkers, deal with normal work stress.   [Exhibit 20F is] a clinical note from around the same time, about a month earlier, and Dr. Samant gives a GAF of 60.   It says that your client is cooperative, clear, and coherent.   Affect is appropriate.   Mood is anxious.   Wears a hood to cover his face.   No delusions, hallucinations, mood swings, racing thoughts, or suicidal ideation. He is alert and oriented.   Underlying cognitive function is grossly intact.   No organicity.   Memory of recent past is intact.   Insight and judgment are fair. It says that he goes out with his friend.   He has one friend.   He remains medically stable.   He saw a cardiologist who stated that his heart is fine. How am I to line up the limitations that Dr. Samant stated of no useful ability to function in the face of a clinical exam that shows that[ he]s] cooperative, clear, and coherent?
>
> ATTY: Judge, I wish I could answer that.   You know, I'm not the treating physician here, and so I'm not going to try to speculate as to why Dr. Samant had indicated that.   Yeah, I think I'm just going to leave it at that, Judge.
>
> ALJ: Okay.

ATTY: I'm not going to opine on that.   I think --- yeah.

ALJ: Okay.

Tr. at pp. 99-100.

Following the hearing the Administrative Law Judge ("ALJ") issued a decision finding that Plaintiff was not disabled at any time between the date of application and the date of the decision.   In doing so, the ALJ applied the familiar five-step sequential evaluation set forth earlier.   In pertinent part, at step two of the sequential evaluation the ALJ found that Plaintiff has serious mental impairments consisting of panic disorder with agoraphobia, social phobia and attention deficit hyperactivity disorder.   Prior to reaching the fourth step of the sequential evaluation, the ALJ found that Plaintiff has the RFC to perform work at all exertional levels, with non-exertional limitations including being limited to simple repetitive tasks and incidental contact with the public and only occasional contact with coworkers and supervisors.   The ALJ went on to find that Plaintiff, who has never worked and therefore has no past relevant work history, could perform "other work" and was therefore not disabled.

In connection with his RFC finding, the ALJ conducted a detailed review of Plaintiff's subjective claims, the medical treatment record, and the medical opinion evidence.   In that regard, the ALJ devoted a significant amount of discussion to Plaintiff's poor compliance with taking his medications, and the reasons that Plaintiff gave therefor.   The ALJ also discussed how Plaintiff's symptoms reportedly improved when he took his medications, and how Plaintiff's mental status examinations were generally benign (and often inconsistent with his subjective complaints) even when he claimed that he was *not* taking

his medications.[27]   The ALJ also referenced reports indicating that Plaintiff was pursuing activities of daily living that were inconsistent with his subjective complaints.   The ALJ further referred to statements by Plaintiff in the treatment records which indicated both that Plaintiff had lied to his therapist at times and that his goal in pursuing treatment was to qualify for public assistance and/or SSI benefits.

With regard to the medical opinion evidence, the ALJ focused primarily on the 2013 report[28] from Dr. Samant, mentioned earlier, and on two reports of Dr. Santarpia ("Santarpia"), a consultative psychologist who examined Plaintiff twice at the request of the Commissioner, once in 2012 and once in 2016.[29] The ALJ discussed the various opinions contained in Samant's report, but ultimately gave the report "little weight," finding that it was "not consistent with the available treatment notes."   On the other hand, the ALJ gave "great weight" to Santarpia's reports, finding that they were consistent with Santarpia's reported findings.   However, the ALJ declined to give great weight to Santarpia's opinion that Plaintiff would have only "mild" limitations in dealing with other people, finding instead that, according to the treatment records, Plaintiff should have only occasional interaction with co-workers and supervisors and only incidental contact with the public.

In the instant action, Plaintiff contends first that the ALJ incorrectly applied the "Treating Physician Rule" to Samant's opinion.   In that regard, Plaintiff contends that the

---

[27] Tr. at pp. 23-27.

[28] Tr. at pp. 623-629.

[29] Samant indicated on his RFC assessment that he saw Plaintiff at least monthly, but that is not correct according to the treatment record, which indicates that Samant saw Plaintiff much less frequently, on an "as needed basis," such as at 3- or 4- or even 6-month intervals, typically for approximately 15 to 20 minutes at a time. *See, e.g.*, Tr. at pp. 570, 585, 596, 631, 637.   Indeed, According to the Court's notes, the record indicates that Samant saw Plaintiff only 11 times over the course of 3 years, usually for 15 to 20 minutes at a time, to review Plaintiff's medications.   At such appointments Samant would list Plaintiff's subjective complaints and perform a mental status examination.

ALJ did not give controlling weight to the opinion of Samant, a treating physician, and "failed to properly evaluate this treating opinion and provide good reasons beyond a simple assertion the opinion was 'inconsistent' with the record." Pl. Memo of Law at p. 19. According to Plaintiff, the ALJ did not identify or explain the alleged inconsistencies between the treatment record and Samant's opinion.   Plaintiff further contends that in addition to being inadequate, the ALJ's explanation was incorrect, since Samant's opinion is actually consistent with the treatment record, which does not show that Plaintiff's condition improved even when he was compliant with treatment.   On this point, Plaintiff insists that "[n]othing in the record suggests compliance improved his symptoms." Pl. Memo of Law at p. 19; *see also*, Pl. Reply at p. 2 ("Defendant's assertion Plaintiff improved is incorrect.").

Plaintiff also maintains that the RFC finding regarding his ability to interact with the public is not supported by substantial evidence, but rather, is based on the ALJ's lay opinion.   On this point, Plaintiff argues that after essentially rejecting Samant's opinion, the ALJ also rejected the portion of Santarpia's opinion indicating that Plaintiff had only mild limitations in interacting with the public, finding instead that Plaintiff should have only occasional contact with co-workers and supervisors.   Plaintiff maintains that was error, since the ALJ needed an expert opinion from a "medical professional" to support the finding regarding Plaintiff's ability to interact occasionally with supervisors, co-workers. *See*, Pl. Memo of Law at p. 23 ("The ALJ felt Plaintiff had greater limitations than Dr. Santarpia found and he then needed to have an opinion as to that.").   Plaintiff further argues that, apart from whether the ALJ improperly relied on his own lay opinion, the record does not contain substantial evidence that he can interact with the public even

occasionally.

Plaintiff also contends that the ALJ erred by failing to consider or recognize that Plaintiff's non-compliance with treatment was a symptom of his mental illness.   Instead, Plaintiff asserts that the ALJ erroneously "faulted" him for his non-compliance without recognizing that it is part of his illness.

Defendant responds that the ALJ properly gave only little weight to Dr. Samant's opinion, since it was inconsistent with the treatment record, which indicates that Plaintiff's condition improved significantly when he took his medications, contrary to what Plaintiff maintains.   In that regard, Defendant contends that the ALJ discussed the treatment record and gave good reasons for the weight that the assigned to Samant's opinion. Defendant also maintains that the ALJ properly gave great weight to Santarpia's opinion, since it was consistent with her findings from her two examinations of Plaintiff.   Defendant further argues that Plaintiff is incorrect to assert that the ALJ's RFC findings must correspond perfectly to a particular medical opinion, stating that, "the ALJ was not required to adopt all of Dr. Santarpia's opinion verbatim and was free to formulate a more restrictive RFC based on the entire record." Def. Memo of Law at p. 20.   In that regard, Defendant maintains that the record contains substantial evidence supporting the RFC finding that Plaintiff can have occasional interaction with the public.   Finally, Defendant contends that it was proper for the ALJ to consider Plaintiff's noncompliance with treatment when evaluating the claim, and that the ALJ considered and discussed the various reasons given by Plaintiff for his noncompliance.

The Court has reviewed the entire record and has considered the parties'
submissions.

DISCUSSION

The ALJ Did Not Violate the Treating Physician Rule

Plaintiff contends that the ALJ violated the Treating Physician Rule[30] by failing to
explain how Dr. Samant's opinion was inconsistent with the treatment record, and by
incorrectly finding that Plaintiff's condition improved when he complied with treatment.
The Court does not agree with either of those assertions.

Plaintiff's first argument on this point involves the well-settled principle that,

> [w]hen assigning less than "controlling weight" to a treating physician's
> opinion, the ALJ must "explicitly consider" the four factors announced in
> *Burgess v. Astrue*, 537 F.3d 117 (2d Cir. 2008). *Estrella v. Berryhill*, 925 F.3d
> 90, 95 (2d Cir. 2019) (internal quotation marks omitted). Those factors are
> "(1) the frequen[cy], length, nature, and extent of treatment; (2) the amount of
> medical evidence supporting the opinion; (3) the consistency of the opinion
> with the remaining medical evidence; and (4) whether the physician is a
> specialist." Id. at 95–96 (citation omitted).   A reviewing court should remand
> for failure to consider explicitly the *Burgess* factors unless a searching review
> of the record shows that the ALJ has provided "good reasons" for its weight
> assessment. *Id.* at 96.

*Meyer v. Comm'r of Soc. Sec.*, 794 F. App'x 23, 26 (2d Cir. 2019).   Put differently, an
ALJ's failure to explicitly consider the *Burgess* factors when assigning less-than-controlling
weight to a treating physician's opinion is a "procedural error" that will require remand,

---

[30] Proper evaluation of a treating physician's opinion is a two-step process in which the ALJ must first decide
whether to give controlling weight to the opinion and, if not, then must determine the amount of weight to give
the opinion. *See, Estrella v. Berryhill*, 925 F.3d at 95 ("Social Security Administration regulations, as well as
our precedent, mandate specific procedures that an ALJ must follow in determining the appropriate weight to
assign a treating physician's opinion. First, the ALJ must decide whether the opinion is entitled to controlling
weight . . . . Second, if the ALJ decides the opinion is not entitled to controlling weight, it must determine how
much weight, if any, to give it.").   The ALJ's decision at both steps must be supported by substantial
evidence. *Id.* at 96.

unless the ALJ provides sufficiently good reasons for his weight assignment that the court can conclude the substance of the treating physician rule was respected. *See, Estrella v. Berryhill*, 925 F.3d at 96 ("An ALJ's failure to 'explicitly' apply the *Burgess* factors when assigning weight at step two is a procedural error.   If the Commissioner has not otherwise provided 'good reasons' for its weight assignment, we are unable to conclude that the error was harmless and consequently remand for the ALJ to comprehensively set forth [his or her] reasons. If, however, a searching review of the record assures us that the substance of the treating physician rule was not traversed, we will affirm.") (citation and internal quotation marks omitted).

Here, the ALJ expressly indicated that he evaluated the medical opinion evidence in accordance with 20 CFR 416.927.   Additionally, the ALJ reviewed all of Plaintiff's symptoms, along with the relevant medical records and Plaintiff's reported activities of daily living, and discussed the extent to which Plaintiff's complaints either were or were not supported by the evidence.   The ALJ ultimately concluded that Samant's opinion (that Plaintiff essentially had "no useful ability" to work due to mental limitations) was entitled to only little weight since it was inconsistent with the record as whole which showed that Plaintiff's condition significantly improved when he took his medications, and that Plaintiff's compliance had improved.[31]   To the extent Plaintiff now maintains that that the ALJ offered only a single sentence to explain the weight that he assigned to Samant's report,

---

[31] The Court recognizes that as a general rule, an ALJ should not give more weight to the opinion of a non-examining- or one-time-examining-consultant doctor than to the opinion of a treating doctor, particularly in cases such as this involving mental illness. See, Estrella v. Berryhill, 925 F.3d at 98 ("We have frequently cautioned that ALJs should not rely heavily on the findings of consultative physicians after a single examination.   This concern is even more pronounced in the context of mental illness where . . .   a one-time snapshot of a claimant's status may not be indicative of her longitudinal mental health.") (citation and internal quotation marks omitted).   Here, though, the ALJ provided good reasons for doing so.

Plaintiff is focusing on a sentence in which the ALJ summarized his conclusion as to Samant's report while ignoring the rest of the ALJ's analysis.   In sum, the Court finds that the ALJ provided the required "good reasons" for the weight that he assigned to Samant's opinion.   Further, the Court finds that the ALJ's ruling on that point is supported by substantial evidence that Plaintiff is not as limited as Samant indicated.

Finally, Plaintiff's contention, that the ALJ erred by indicating that Plaintiff's condition improved when he took his medication, also lacks merit.   In that regard, Plaintiff's assertion that his condition did not improve even when he took his medication is refuted by the record, including Plaintiff's own testimony in which he acknowledged that his condition improved when he took his medications.

<u>The ALJ Did Not Substitute His Own Opinion for Competent Medical Evidence</u>

Plaintiff next contends that the ALJ improperly relied on his own lay opinion, rather than on competent medical opinion, when making his RFC finding concerning Plaintiff's ability to interact with others.   The Court again disagrees.

It is of course well settled that an ALJ cannot arbitrarily substitute his own lay opinion for competent medical opinion evidence. *See, e.g., Riccobono v. Saul*, 796 F. App'x 49, 50 (2d Cir. 2020) ("[T]he ALJ cannot arbitrarily substitute h[er] own judgment for competent medical opinion." *McBrayer v. Secretary of Health and Human Servs.*, 712 F.2d 795, 799 (2d Cir. 1983).").   However, an ALJ is entitled to make an RFC finding that is consistent with the record as a whole, even if it does not perfectly match a particular medical opinion. *See, Matta v. Astrue*, 508 F. App'x 53, 56 (2d Cir. 2013) (Rejecting argument that ALJ had improperly substituted his medical judgment for expert opinion, stating that: "Although the ALJ's conclusion may not perfectly correspond with any of the

opinions of medical sources cited in his decision, he was entitled to weigh all of the evidence available to make an RFC finding that was consistent with the record as a whole."); *see also, Camille v. Colvin*, 652 F. App'x 25, 29 n. 5 (2d Cir. 2016) ("The ALJ used Dr. Kamin's opinion as the basis for the RFC but incorporated additional limitations based on, inter alia, the testimony of Camille that she credited. An ALJ may accept parts of a doctor's opinion and reject others.") (citations omitted).

Notably, in *Matta* the ALJ had found that the claimant had only "moderate" limitations in social functioning, even though a doctor had opined that the claimant had "marked" limitations in social functioning, and even though no doctor had indicated that the claimant had only moderate limitations. *Matta*, 508 F. App'x at 55-56.   However, the Second Circuit indicated that the ALJ had not erred, since the RFC finding was consistent with the record as a whole. *See, id.* at 56 ("Plaintiff asserts that the ALJ substituted his own medical judgment for these expert opinions in concluding that "substantial evidence revealed [plaintiff's] condition stabilized and at the most, he had moderate symptoms." We disagree.   Although the ALJ's conclusion may not perfectly correspond with any of the opinions of medical sources cited in his decision, he was entitled to weigh all of the evidence available to make an RFC finding that was consistent with the record as a whole.").

Here, the ALJ's finding that Plaintiff could have occasional contact with co-workers and supervisors and incidental contact with the public was not erroneous, since it is supported by substantial evidence[32]  and is consistent with the record as a whole even

---

[32] The ALJ discussed the evidence concerning Plaintiff's ability to socialize. *See, e.g.*, Tr. at pp. 27 ("[T]he claimant reported improvement with medication to where he was better able to handle large crowds . . . the

though it does not correspond perfectly to a particular medical opinion.

<u>The ALJ Considered the Reasons for Plaintiff's Non-Compliance with Treatment</u>

Finally, Plaintiff asserts that the ALJ failed to consider that Plaintiff's non-compliance with treatment was a symptom of his mental illness, and inappropriately penalized Plaintiff for his noncompliance.   The Court again must disagree.

Of course, in some cases it may be inappropriate for an ALJ to cite a claimant's noncompliance with treatment as evidence that the claimant's impairment is less severe than what is being alleged.   For example, it would be inappropriate to draw such a negative inference where a claimant could not afford medication or where the treatment had already proven to be unhelpful. *See, e.g., Shaw v. Chater*, 221 F.3d 126, 133 (2d Cir. 2000) ("Given the many times plaintiff was treated between his 1977 accident and March 1982, and that his condition did not improve, it was not unreasonable for him to discontinue those treatments, particularly in light of his testimony that he could not afford further medical care.   It would fly in the face of the plain purposes of the Social Security Act to deny claimant benefits because he is too poor to obtain additional treatment that had proved unhelpful.") (citations omitted). Not surprisingly, courts have also indicated that an ALJ should not draw negative credibility inferences from the failure of a mentally-ill claimant to follow treatment recommendations where such failure is a feature of the mental illness. *See, e.g., Simpson v. Colvin*, No. 6:15-CV-06244 EAW, 2016 WL 4491628, at *15 (W.D.N.Y. Aug. 25, 2016) ("It has been noted by courts that faulting a person with diagnosed mental illnesses for failing to pursue mental health treatment is a questionable

---

claimant also reported going out into public more, such as to stores, and that he was speaking to people at the registers."); 29 (Plaintiff has moderate difficulty socializing).

practice.") (citations and internal quotation marks omitted, collecting cases).   The Second Circuit has also indicated that an ALJ should afford a claimant an opportunity to explain his noncompliance with treatment before drawing any adverse inference. *See, Vincent v. Comm'r of Soc. Sec.*, 651 F.3d 299, 302 (2d Cir. 2011) ("[T]he ALJ could not rely on Vincent's alleged noncompliance with prescribed treatment as a basis for denying benefits, or even for an adverse credibility finding, without allowing her to explain why she did not follow any such treatment.").

Here, Plaintiff asserts that, "The ALJ erred by failing to account for Plaintiff's non-compliance as a symptom of his anxiety and agoraphobia."[33]   However, that statement is demonstrably incorrect, since, both at the hearing and in his decision, the ALJ went to great lengths to explore the reasons for Plaintiff's non-compliance with treatment. Moreover, the ALJ's decision expressly refers to the connection between Plaintiff's impairments and his refusal at times to take his medications:

> Treatment notes during this period indicate that medication improved the claimant's symptoms, including some anxiety reduction and increased interest in things, *but they also reflect the claimant's struggle with medication compliance due to ongoing anxiety and panic about taking such medications.*

Tr. at p. 26 (emphasis added).

Further, rather than simply drawing a negative inference against Plaintiff based on his noncompliance, as Plaintiff seems to suggest happened, the ALJ discussed how Plaintiff subsequently improved his medication compliance, and how, thereafter, even when he claimed not to have taken his medications he still showed improvement, in the

_____

[33] Pl.'s Mem. of Law at p. 1.

opinions of his treatment providers:

> [D]uring an October 2012 visit with Ms. MacDougall, the claimant reported medication compliance for over one month.   Ms. MacDougall noted that he did not wear a hat or sweatshirt covering his head during the visit and he exhibited improved processing and eye contact as well as increased positivity.   Treatment notes from appointments with Ms. MacDougall in January and February 2013 indicate that the claimant was again non-compliant with his medication, first due to insurance reasons and then for an unreported reason, *but he was able to notice the change in his symptoms during this time and became more accepting of medication therapy*.   By March 2013, the claimant presented with mild anxiety, appeared for the appointment in an appropriate fashion, and reported being about 75 percent medication complian[t] during the previous few weeks as well as making progress with online GED classes.   The claimant met with Dr. Samant for a follow-up appointment in May 2013, and treatment notes from this visit show that the claimant was doing well on his current medication regimen and was tolerating his medications well.
>
> ***
>
> During a visit with Ms. MacDougall in June 2013, the claimant reported missing his medications the previous month, resulting in increased anxiety and isolation with agoraphobia.   Ms. MacDougall noted that the claimant exhibited no abnormal mental status findings, and she observed his ability to attend and maintain focus.   *Despite the claimant's continued struggle with medication and therapy compliance*, Ms. MacDougall noted that he exhibited excellent motivation and was able to focus on relevant topics, see different perspectives, and accurately identify and express feelings.   Likewise, at a follow up visit in July 2013, the claimant continued to report medication noncompliance, but the claimant was observed to only have moderate anxiety, and he otherwise was noted to be cooperative with appropriate affect, good eye contact, normal speech, and no deficits in attention, concentration or memory.

ALJ's Decision, Tr. at p. 26 (emphasis added); *see also, id.* at pp. 27-28 (The ALJ

discussed subsequent treatment notes showing overall improvement despite lapses in

compliance.).   Consequently, the Court finds that Plaintiff's argument on this point lacks

merit since the ALJ neither failed to account for, nor improperly relied on, Plaintiff's

noncompliance with treatment.

CONCLUSION

For the reasons discussed above, Plaintiff's motion for judgment on the pleadings (ECF No. 10) is denied, Defendant's cross-motion (ECF No. 11) for the same relief is granted, and this matter is dismissed.   The Clerk of the Court is directed to enter judgment for Defendant and close this action.   The Court hereby certifies, pursuant to 28 U.S.C. § 1915(a)(3), that any appeal from this Order would not be taken in good faith and leave to appeal to the Court of Appeals as a poor person is denied. *Coppedge v. United States*, 369 U.S. 438 (1962).   Further requests to proceed on appeal in forma pauperis should be directed on motion to the United States Court of Appeals for the Second Circuit in accordance with Rule 24 of the Federal Rules of Appellate Procedure.

So Ordered.

Dated: Rochester, New York
       February 10, 2021

ENTER:

CHARLES J. SIRAGUSA
United States District Judge